```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        WACO DIVISION

 3

 4   UNITED STATES OF AMERICA,      *    No. W-11-CR-182
                                    *        W-11-167M
 5           Plaintiff,             *
                                    *
 6   VS.                            *    AUGUST 4, 2011
                                    *
 7   NASER JASON ABDO,              *
                                    *
 8           Defendant.             *    WACO, TEXAS
                                    *
 9   ---------------------------------------------------------

10

11          TRANSCRIPT OF PRELIMINARY HEARING
          BEFORE THE HONORABLE JEFFREY MANSKE
12           UNITED STATES MAGISTRATE JUDGE

13   ---------------------------------------------------------

14                  A P P E A R A N C E S

15

16   FOR THE GOVERNMENT:       UNITED STATES ATTORNEY'S OFFICE
                               BY: MARK FRAZIER
17                             Assistant U.S. Attorney
                               800 Franklin Avenue, Suite 280
18                             Waco, Texas  76701

19

20   FOR THE DEFENDANT:        FULBRIGHT & WINNIFORD
                               BY: KEITH DORSETT
21                             425 Austin Avenue, #2214
                               Waco, TX 76701
22

23

24   Proceedings recorded by electronic sound recording.  Transcript
     produced by transcription service.
25
```

# I N D E X

PAGE

FOR THE GOVERNMENT:

   FBI SPECIAL AGENT MICHAEL BROGAN
      (Direct Examination by AUSA Frazier)................ 3
      (Cross Examination by Mr. Dorsett)................. 21


FOR THE DEFENSE:

   FBI SPECIAL AGENT JAMES RUNKEL
      (Direct Examination by Mr. Dorsett)................ 44

   FBI SPECIAL AGENT STEVEN HAUCK
      (Direct Examination by Mr. Dorsett)................ 52


CLOSING ARGUMENTS BY THE GOVERNMENT..................... 55

CLOSING ARGUMENTS BY THE DEFENSE........................ 57


COURT REPORTER'S CERTIFICATE............................ 60

# E X H I B I T S

NONE

* * * * * *

1  (START TIME, 2:02:06 P.M.)

2         COURTROOM DEPUTY:  Calling Case Number W-11-167M, the

3  United States of America versus Naser Jason Abdo.

4         AUSA FRAZIER:  Mark Frazier for the United States.

5  Good afternoon.

6         THE COURT:  Good afternoon, Mr. Frazier.

7         MR. DORSETT:  Your Honor, Keith Dorsett for the

8  defendant, Naser Jason Abdo.

9         THE COURT:  Good afternoon, Mr. Dorsett.

10        MR. DORSETT:  Good afternoon.

11        THE COURT:  Is the government ready to proceed?

12        AUSA FRAZIER:  We are, Your Honor.

13        THE COURT:  All right.  Is the defense ready to

14  proceed?

15        MR. DORSETT:  Yes, Your Honor.

16        THE COURT:  Are there any matters we need to take up

17  before we begin?

18        MR. DORSETT:  Not at this time.

19        THE COURT:  All right.  Thank you.

20         Mr. Frazier, if you'd like to call your first

21  witness.

22        AUSA FRAZIER:  Yes, Your Honor.  We'll call Michael

23  Brogan as our witness.

24

25

1                          **MICHAEL BROGAN,**

2    having first been duly sworn, testified to the following:

3

4           THE COURT:  All right.  You may proceed once he's

5    seated.

6           AUSA FRAZIER:  Thank you, Your Honor.

7                       DIRECT EXAMINATION

8    BY AUSA FRAZIER:

9    Q    Now, would you please state your name for the record, sir.

10   A    Michael Brogan.

11   Q    And how are you employed?

12   A    I'm a Special Agent Bomb Technician with the Federal Bureau

13   of Investigation.

14   Q    And what office are you assigned to?

15   A    I'm office -- assigned to the San Antonio Division.

16   Q    And -- and what do you do on a day-do-day basis for the FBI

17   as a bomb technician?

18   A    Basically response training, call-outs, whatever.

19   Q    All right.  And can you tell the Court what qualifies you

20   for that position?

21   A    I'm a graduate of the FBI Hazardous Devices School in

22   Huntsville, Alabama.  I've been a bomb technician about ten

23   years now.

24   Q    All right.  And have you had any specialized training in

25   addition to that received through the FBI or experiences in your

1   background regarding explosives or improvised explosive devices?

2   A    Yes.  I've been through the Navy Advanced Access and

3   Disablement Course.  I've also deployed to Bagdad in 2004.

4   Q    All right.  What did you do while in Bagdad?

5   A    Post class; responses, bomb technician work.

6   Q    Okay.  Are you familiar -- are you familiar with improvised

7   explosive devices?

8   A    Yes, sir, I am.

9   Q    And are you trained based on your experience -- experiences

10  and your training to recognize and identify those devices?

11  A    Yes, sir.

12  Q    Does that include the components or parts necessary to

13  construct those devices?

14  A    Yes, sir, it is.

15  Q    And have you given opinions in the past regarding explosive

16  or incendiary devices or improvised explosive devices?

17  A    Yes.

18  Q    And have you done that few or many times?

19  A    Many, as in more than ten.

20  Q    Okay.  Now I want to direct your attention back to the

21  dates.  First of all, before we go into the -- to the background

22  on this, have you familiarized yourself with the facts

23  pertaining to the investigation that led to the arrest of the

24  defendant before the Court?

25  A    Yes.

1  Q    And have you done that by reviewing police reports and FBI

2  302's?

3  A    Yes, sir.

4  Q    Okay.  On July 26 of this year -- I want to direct your

5  attention to the -- that date.  In the afternoon or evening of

6  that particular date, did the Killeen Police Department receive

7  a telephone call from a citizen working at a gun shop regarding

8  some suspicious or unusual activity?

9  A    Yes, they did.

10 Q    And tell the Court what happened.

11 A    One of the employees at Guns Galore, which is a gun store

12 in Killeen, called the Killeen Police Department saying an

13 individual had bought six pounds of smokeless powder,

14 Springfield magazine, three boxes of 12-gauge shotgun shells.

15 He asked for .40 cal ammunition but did not buy any, and he

16 asked about black powder but he said they did -- the store

17 didn't sell black powder.  He paid in cash.  And it was -- it

18 was suspicious because he didn't -- he didn't know exactly what

19 he was buying as far as the -- the smokeless powder.

20 Q    And was this -- who was -- who was the name of the person

21 who actually called you?

22 A    Greg Ebert.

23 Q    And he was a former police -- policeman, police sergeant,

24 there in Killeen at one time?

25 A    That's what I understand.

1    Q    Okay.  And again, how did all that strike Mr. Ebert as

2    unusual?  In other words, what would smokeless powder, you know,

3    those type of things be normally used for?

4    A    Well, it's -- it's used for reloading.  And he had bought

5    different types of smokeless powder for shotguns, rifles,

6    pistols.  And Mr. Ebert, being a reloader, asked him questions,

7    "Why didn't you buy caps or brass or anything else," I guess,

8    and he didn't know or have any answers for that.

9    Q    Okay.  And then after he paid for the items, I believe you

10   indicated in cash, what did the customer do?

11   A    He left the store and got into a taxi, blue taxi.  Luxury

12   Taxi I think it's called.

13   Q    Luxury was the name of the company?

14   A    Company, yeah.

15   Q    Okay.  And it was after that -- sometime after that that

16   Mr. Ebert called the Killeen Police department; is this correct?

17   A    That's correct.

18   Q    And was -- did the Killeen Police, were they able to obtain

19   color stills -- that is still photographs -- from the

20   surveillance camera of Guns Galore of the customer who was

21   making the purchases?

22   A    Yes, they did.

23   Q    And later that day did the Killeen Police Department do --

24   other detectives working on the night shift do some follow up on

25   the report from Mr. Ebert?

```
1    A    Yes, they did.

2    Q    And what did they do?

3    A    They contacted, I think, the Luxury Cab driver, and the

4    driver stated that he picked up the customer from Guns Galore

5    and drove him to, I think, a surplus store.  Surplus City in

6    Killeen.

7    Q    All right.  And did he indicate where they originated?

8    That is, before they went to Guns Galore, did the cab driver

9    indicate that he had picked up the person up at a --

10   A    Right.

11   Q    -- particular place?

12   A    He picked him up --

13   Q    Where was that?

14   A    Prior to going to Guns Galore, picked him up at America's

15   Best Value inn and Suites --

16   Q    Okay.

17   A    -- in Killeen.

18   Q    Okay.  And later did the Killeen night shift detectives

19   brief the day shift for the 27th as to what they'd found?

20   A    Yes, sir, they did.

21   Q    Okay.  Now, what happened on July 27th, the next morning?

22   The Killeen Police detectives, what did they do?

23   A    I think their first stop, they went to Surplus City and

24   talked to the owner of that store.

25   Q    And what did the owner of the store tell the Killeen Police
```

1  Department?

2  A    Customer came in, bought a complete ACU Army uniform with

3  a -- they sewed on a name patch, I think, with the name of

4  "Smith" and Sergeant E-5 rank.

5  Q    Okay.  Did the customer ask any questions about Fort Hood

6  or the unit at Fort Hood?

7  A    I think he stated he just wanted a Fort Hood patch and

8  the -- I guess the owner said, What unit?  And he didn't know.

9  He said he thinks it had a one in it.  So the owner said, Maybe

10  that's First Cav, First Calvary Division.  Then the customer

11  said he came from Kentucky and they -- they thought 101st

12  Airborne from -- from Kentucky, I guess.

13  Q    Okay.  Did -- did that strike the owner as usual, that the

14  customer didn't know what unit he was going to be in at Fort

15  Hood?

16  A    Yes, it did a little bit.

17  Q    Okay.  And after he purchased the uniform, what happened?

18  A    He forgot -- forgot a belt.  He had to go back, I guess,

19  and -- or turned around to buy a belt, and then he put the whole

20  uniform, everything on, in the bathroom of the store.

21  Q    And what did he do then?

22  A    Left in a red cab, which I guess was Cove Taxi.

23  Q    Okay.  Killeen Police later identified it as Cove Taxi,

24  correct?

25  A    Right.

1    Q    And did Killeen Police detectives follow up with Cove Taxi?

2    A    Yes, they did.  And the taxi said that the -- they took the

3    customer from the surplus store back to America's Best Value Inn

4    and Suites in Killeen.

5    Q    All right.  And so at that point I assume the Killeen

6    Police decided to investigate that -- the customer, this person,

7    further, correct?

8    A    Yes.

9    Q    Okay.  What did they do at that point?

10   A    They contacted the CID at Fort Hood, based on the fact he

11   eluded to the fact he was in the Army or -- or whatever like

12   that.

13   Q    And then what did they do?

14   A    Well, the detectives -- Killeen Police Department

15   Detectives, I guess, kind of set up in America's Best -- Best

16   Value Inn and Suites parking lot.  And I think one of the

17   detectives went in to try to do some investigation, show them

18   pictures around the -- to some employees.

19   Q    Okay.  Now that America's Best Value Inn and Suites, that's

20   located in Killeen, that's in Bell County Texas, correct?

21   A    Yes.

22   Q    And that's located in the Waco Division of the Western

23   District of Texas?

24   A    Yes.

25   Q    Okay.  And what did the Killeen Police detectives do with

1  the employees or the management there at the hotel?

2  A    They showed them photos that they had received earlier, I

3  guess, from Guns Galore, the surveillance stuff photos and

4  showed it to the employees.  And then they went through the

5  registration receipt books, because I guess they kept -- burn

6  copies of -- of identification too.

7  Q    And did they find one belonging to someone with a

8  Tennessee -- who had had a Tennessee drivers license or

9  identification?

10  A    That is correct.  They had a Tennessee ID of a white male,

11  same characteristics, but -- but kind of different as far as

12  hair line maybe or height.

13  Q    All right.  And did the motel management identify who that

14  person -- what -- who -- how they identified themself when they

15  checked into the hotel?

16  A    They identified themselves as an Asher Pluto, and

17  originally checked into Room 248.  It was a double room, he

18  wanted a single room, so I think on the 26th sometime late they

19  moved him to Room 230.

20  Q    All right.  And Asher Pluto was the name that was on the ID

21  card that they had made a copy of, correct?

22  A    At the check-in registration, yes.

23  Q    Okay.  And so did Killeen Police then try to match the ID

24  of the person they had on surveillance photos with the person --

25  with the person that they had the identification for?

1    A    Yes, they did.

2    Q    Okay.  And now was there something that the customer was

3    wearing in the video that was of note to them?

4    A    He had University of Texas type clothing on.

5    Q    Okay.  Now while Killeen Police were there, did one of the

6    detectives see someone in the lobby matching the description of

7    the person they had seen on the surveillance footage on the

8    video?

9    A    Yes, they did.

10    Q    Okay.

11    A    Someone -- customer was seen in the motel lobby exiting

12    the -- the hotel.

13    Q    Okay.  And where were they going?

14    A    They were probably going to a cab that was -- had just

15    pulled up and was waiting in the parking lot.

16    Q    Okay.  And did the customer have anything with them?  Were

17    they carrying anything?

18    A    Yes, he did.  He had a black backpack.

19    Q    Okay.  And so based on the circumstances up to this point,

20    did the Killeen Police elect to detain the individual?

21    A    Yes, they did.

22    Q    Okay.  Did they ask for identification of the individual

23    when he was detained?

24    A    Yes.

25    Q    And what happened during that encounter?

1  A    He did give them, I guess, his correct name of Naser Jason

2  Abdo, but he had somebody else's ID.

3  Q    Okay.  So the ID he checked in was for -- the one for Asher

4  Pluto?

5  A    Asher Pluto.

6  Q    And that turned out to be the descriptors on it were

7  different than the actual descriptors of Mr. Abdo, correct?

8  A    That's correct.

9  Q    All right.  And is Mr. Naser Jason Abdo the defendant

10 before the Court today?

11 A    Yes, sir, he is.

12 Q    And that's the person the Killeen Police detectives

13 detained in the parking lot --

14 A    Parking lot.

15 Q    -- I guess it was, of the hotel?

16 A    Right.

17 Q    All right.  Was Mr. Abdo about to go somewhere or do -- or

18 what were the circumstances of Mr. Abdo being in the parking

19 lot?  Was he getting a cab or anything like that or --

20 A    Yes.  Just -- just getting -- probably going to the cab.

21 Q    Okay.  Because there was a cab there waiting --

22 A    Yes.

23 Q    -- is that correct?

24      All right.  Now after -- when he was detained, was

25 he given his Miranda warnings by the Killeen Police detectives?

1  A    Yes, he was.

2  Q    And did he indicate that he understood his rights and that

3  he waived his rights?

4  A    Yes.

5  Q    What did Mr. Abdo tell the Killeen Police detective?

6  A    He had informed them that he was a soldier in the Army,

7  conscience objective from Fort Campbell, he was AWAL and he was

8  pending, I think, child pornography charges.

9  Q    Okay.  And did he make any other statements upon

10  questioning by the -- or did he make any other statements to the

11  Killeen Police detective?

12  A    Yes.  He said he was intending to make a massive attack in

13  the Killeen/Fort Hood area.

14  Q    Okay.  Did the Killeen Police detective inquire about that?

15  A    Yes, he did.

16  Q    What did he ask?

17  A    He asked additional things about what -- what is in the

18  backpack and so forth.

19  Q    And what about the -- did he ask him about the items that

20  he had purchased previously?

21  A    Yes.

22  Q    Okay.  And what did -- did Mr. Abdo respond to that

23  question?

24  A    That some things were in his backpack and the rest of the

25  items were up in his room.

1   Q    Okay.  Now, do -- as part of the normal process -- or

2   process, did the Killeen Police Department run a warrants check

3   on Mr. Abdo?

4   A    Yes, they did.

5   Q    And what did they find?

6   A    That he had outstanding warrants for child pornography and

7   AWOL from Fort Campbell, I think.

8   Q    All right.  And at that point, what happened to Mr. Abdo?

9   A    He was placed under formal arrest.

10  Q    Okay.

11  A    Formally arrested him.

12  Q    Now, what steps did the Killeen Police take next after --

13  after Mr. Abdo's formal arrest?

14  A    They called the Fort Hood Explosive Ordinance Disposal Unit

15  and evacuated the hotel and isolated the backpack.

16  Q    Okay.  When you say "isolate," you mean sep -- moved it

17  away from where there were people or structures, things of that

18  nature?

19  A    Right.

20  Q    Okay.  When EOD and the -- the Fort Hood EOD, when they

21  arrived at the scene, tell the Court what they did.

22  A    They remotely opened the backpack and searched it instant

23  to arrest and they found several items in it.

24  Q    And what items of note -- among other items, which are the

25  most -- the items they found that were of interest?

1  A    They found a Springfield XD .40 caliber pistol, a --

2  clocks, wires, wiring, batteries, I think a spiral notebook or a

3  book, and instructions on building a destructive device.

4  Q    Okay.  Did the Killeen Police prepare an affidavit for a

5  search and arrest warrant for Mr. -- a search warrant for

6  Room 230 of the hotel and an arrest warrant for Mr. Abdo?

7  A    Yes, they did.

8  Q    That was submitted to a state district judge in -- or a

9  state judge in Bell County?

10  A    Yes, it was.

11  Q    And was it signed in -- by the judge?

12  A    Yes.

13  Q    And was that warrant later executed on Room 230?

14  A    Yes, sir.

15  Q    And can you tell the Court what was found in Room 230; the

16  relevant items, among other things that were important or of

17  note to you or any other of the investigators.

18  A    Yes, sir.  The relevant -- main relevant items were a box

19  of Christmas lights, two pressure cookers, six pounds of

20  smokeless powder, electrical wire, wall clock, 9-volt batteries.

21  Q    Okay.  Were there any tools in particular that were found

22  there?

23  A    A drill with the drill bits.

24  Q    Okay.

25  A    Reel of tape and some contact cement too.

1    Q    All right.  And was the Army uniform that he purchased

2    found there?

3    A    It was also in the Room 230.

4    Q    Okay.  And when you say those were the "relevant items"

5    that you identified a moment ago -- the Christmas lights in a

6    box, the pressure cooker, those items -- can you tell the Court

7    based on your training and experience why those were -- what's

8    the significance of those items.

9    A    Those are all components that could be assembled to

10   destruct -- to make a destructive device.

11   Q    All right.  And are -- are they all the necessary

12   components to build a destructive device?

13   A    Yes.

14   Q    Okay.  Now, later was Mr. Abdo interviewed by law

15   enforcement?

16   A    Yes, he was.

17   Q    All right.  And was he again re-Mirandised by law

18   enforcement?

19   A    Yes, he was.  He -- and he waived those rights.

20   Q    Okay.  And -- and did -- what -- and generally just -- in

21   summary, what did Mr. Abdo say regarding the components of the

22   destructive device that were in Room 230?  What did Mr. Abdo

23   say?

24   A    That he did possess them and that he intended to construct

25   a explose -- a destructive device with them on that day.

1    Q    "On that day", meaning July 27th?

2    A    27th.

3    Q    Based on your training and experience then, those are all

4    components of a destructive device?

5    A    Yes, sir, they are.

6    Q    And they are -- and I think you've already indicated

7    they're all the components necessary to construct a functional

8    destructive device.

9    A    Yes, sir.

10   Q    Okay.  Now under Title 26 of United States Code, a

11   firearm -- there's a definition of "firearm."  For purposes of

12   Title 26, does that include a destructive device?

13   A    Yes, sir, it does.

14   Q    Now, also under Title 26, under the part of definitions,

15   which is 5845(f), can you tell the Court whether or not the

16   items that were found in Room 230, the six items you identified

17   previously, the Christ -- the box of Christmas lights, two

18   pressure cookers, six pounds of smokeless powder, the electrical

19   wire, the wall clock, the 9-volt batteries -- if those items are

20   parts of -- combination of parts either designed or intended for

21   use in converting any device into a destructive device and from

22   which a destructive device may be readily assembled?  Do you

23   have an opinion on that?

24   A    Yes, sir.  They can be.

25   Q    And -- and what is your opinion?

1  A    Yes, they can be.

2  Q    Okay.  And under that same definition of "destructive

3  device" under Title 26, "a destructive device means any

4  explosive, incendiary bomb, grenade, mine or similar device,"

5  correct?

6  A    Yes, sir.

7  Q    Okay.  All the items that were -- that were in Room 230

8  that you identified previously, are those all items that are --

9  would be needed to build an explosive device, a bomb, or -- or a

10  similar device?

11  A    Yes, sir.

12  Q    Okay.  Now, did you receive information through other FBI

13  agents, a discussion with Ryan Taylor of the Bureau of Alcohol,

14  Tobacco to Firearms here in Waco?

15  A    Yes, I talked to other agents.

16  Q    Okay.  And did Ryan Taylor cause to be checked the registry

17  in the National Firearms Registration and Transfer Record?

18  A    Yes, he did.

19  Q    Okay.  And that's the record where in order to lawfully

20  possess any devices like this, a person would have to be

21  registered in order to lawfully possess those types of devices,

22  correct?

23  A    That is correct.

24  Q    Okay.  And can you tell the Court what the results of the

25  check were that he made of the National Firearms, Registration

1  and transfer record regarding the defendant Mr. -- Mr. Naser

2  Jason Abdo?

3  A    His results were that no destructive devices or any

4  firearms were registered to Mr. Abdo.

5  Q    Okay.  As defined under Title 26?

6  A    Under Title 26.

7           AUSA FRAZIER:  Your Honor, we ask the Court to take

8  judicial notice and consider as part of the evidence in this

9  hearing the affidavit that's been attached to the criminal

10  complaint filed with the Court.

11           THE COURT:  Any objection?

12           MR. DORSETT:  No, your Honor.

13           THE COURT:  All right.  The Court will take judicial

14  notice of said item.

15           AUSA FRAZIER:  The United States passes the witness,

16  Your Honor.

17           THE COURT:  All right.  Mr. Dorsett?

18           MR. DORSETT:  Your Honor, at this time we'd move to

19  admit statement that Special Agent Brogan has given, if one

20  exists.

21           THE COURT:  Mr. Frazier?

22           AUSA FRAZIER:  I don't believe this special agent has

23  given a statement, Your Honor.

24           He -- have you given a statement?

25           THE WITNESS:  No, sir, I have not.

```
 1              THE COURT:  All right.  And since Mr. Brogan has not
 2   given a statement, there's not one to provide.
 3              MR. DORSETT:  No.  Forgive me.
 4                          CROSS EXAMINATION
 5   BY MR. DORSETT:
 6   Q    Good afternoon, Special Agent Brogan.
 7   A    Afternoon, sir.
 8   Q    Am I saying your name correctly; Brogan?
 9   A    Brogan.  Like boot.
10   Q    Very good.  I've got several questions to go over with you
11   if I could about some of the testimony you just gave.  First, I
12   want to start off, you were not present in Killeen on the 26th
13   or 27th were you?
14   A    No, sir, I was not.
15   Q    Ever -- all your testimony is based on people you've talked
16   to or hearsay and things you've read; is that correct?
17   A    Yes, sir.
18   Q    All right.  You have no personal knowledge of everything
19   you just testified to?
20   A    No, sir.
21   Q    Okay.  And you are the witness that the government has
22   called to establish that there's probable cause to believe that
23   an offense has been committed and that my client committed it,
24   correct?
25   A    Yes, sir.
```

 1 | Q    Okay.  Now you -- when Mr. Frazier was talking with you,

 2 | you kept looking down.  Do you have something that you're

 3 | looking at, notes or anything?

 4 | A    Yes, sir.  It's the -- just a bullet note so I wouldn't

 5 | just, you know, ramble.

 6 | Q    May I see it, sir?

 7 | A    Yes, sir.  You may.

 8 |         MR. DORSETT:  May I approach, Your Honor?

 9 |         THE COURT:  You may.

10 | Q    (By Mr. Dorsett) So really everything you just testified

11 | to, you didn't have memorized, you were using a cheat sheet; is

12 | that right?

13 | A    Yes, sir.

14 | Q    Okay.

15 | A    A combination of both.  I -- I knew most of it, but...

16 | Q    Okay.  I'll return that here in a second.  You don't need

17 | it to testify with me, do you?

18 | A    No, sir.

19 | Q    All right.  What specifically did you review to get ready

20 | for your hearing today?

21 | A    Specifically, reviewed the Killeen Police Department

22 | report, the Killeen Police Department search and arrest warrant,

23 | and the interview by the FBI on the 27th of Mr. Abdo.

24 | Q    Okay.  Mr. Frazier also mentioned in his question to you

25 | that you had reviewed some 302s; is that right?

```
 1  A    That was a 302, the -- the interview.  That's the 302, yes,
 2  sir.
 3  Q    Okay.
 4  A    And I also reviewed the National Firearms record check
 5  also.
 6  Q    Okay.  You didn't review like a 29-page report that was a
 7  302?
 8  A    29-page report?
 9  Q    Or it was just of the statements of my client?
10  A    It was -- I think it was like a nine-page 302.  It
11  wasn't...
12  Q    All right.  Is that everything you reviewed?
13  A    Best of my knowledge, yes, sir.
14  Q    Have you -- have you even reviewed the materials that were
15  found?
16  A    Oh, yes, sir.  I had looked at all the evidence in Austin.
17  Q    Okay.
18  A    Or looked at the --
19  Q    The items?
20  A    -- the items.  Right.  Yes, sir.
21  Q    Okay.  And you're a bomb technician?
22  A    Yes, sir.
23  Q    All right.  Anything else now that you can remember that
24  you reviewed to get ready for today?
25  A    No, sir, nothing else.
```

1    Q    Who did you speak with?  Other than Mr. Frazier or an

2    attorney for the government, who did you speak with to get ready

3    for today?

4    A    Just the -- just Mr. Frazier this morning.

5    Q    Okay.  Yesterday or the day before you didn't speak with

6    anybody with the government?

7    A    No, other than we were just boxing up the -- the evidence,

8    I just spoke with the people that were helping me box up some of

9    the evidence that's in the lab.

10   Q    Have you spoken with James E. Runkel about this matter?

11   A    I've spoken to James Runkel, but not on what's --

12   Q    Okay.

13   A    -- what's going on here.

14   Q    All right.  But Mr. Runkel -- is this Mr. Runkel sitting

15   right here at the table with Mr. Frazier?

16   A    Yes, sir.

17   Q    All right.  And then Mr. Frazier asked that the Court take

18   judicial notice of an affidavit that was used to support the

19   complaint in this matter against my client, and it was signed by

20   Agent Runkel; isn't that right?

21   A    Yes, sir.

22   Q    It wasn't signed by you?

23   A    No.

24   Q    Okay.  You haven't spoke with my client, have you?

25        AUSA FRAZIER:  I'm going to object to the relevance of

```
 1   the question.  As counsel knows, all of these hearings are
 2   conducted by hearsay in -- in the manner in which the
 3   government's proceeded in this case.  This line of questioning
 4   is not relevant.
 5          THE COURT:  All right.  I'm going to overrule the
 6   objection.  It goes to what the source of it -- the source of
 7   his knowledge for his testimony today.
 8             You may proceed.
 9          MR. DORSETT:  Thank you, Your Honor.
10   Q    (By Mr. Dorsett) Agent Brogan, Mr. Frazier mentioned to you
11   26 USC 5861(d).  Do you remember that?
12   A    Yes.
13   Q    And it's -- that's my -- that's my understanding that you
14   testified that that statute says it's unlawful to possess a
15   firearm that is not registered with, what was the -- what was
16   outfit, the NFA?
17   A    Yes.
18   Q    Is that correct?
19   A    National -- no.  It's National Firearms Registration and --
20   I forget what the other one is.
21   Q    But that's the charge in the complaint against my client --
22   A    Yes.
23   Q    -- that he possessed a firearm, quote/unquote, that wasn't
24   registered; is that right?
25   A    That is correct.
```

1  Q    All right.  As -- as I understand it and what Mr. Frazier

2  went over with you, section 5845(a)(8) says that a firearm

3  includes a destructive device.

4  A    That is correct.

5  Q    Now, when I go to 5845(f), that defines a destructive

6  device.  Are you familiar with that statute?

7  A    Yes.

8  Q    All right.  There are basically three types of destructive

9  devices listed; are there not?

10 A    No, there's more than that, sir.

11 Q    Well, there sub -- there's subsections (1), (2), and (3),

12 correct?

13 A    Okay, sir.  Yes, sir.

14 Q    You -- do you want me to give you a copy of the statute?

15 A    Yes, sir.

16 Q    Some -- sir?

17 A    Yes, sir.  I don't have it memorized, sir.

18            MR. DORSETT:  May I approach, Your Honor?

19            THE COURT:  You may.

20            MR. DORSETT:  (INAUDIBLE.  OFF THE MIC)

21 Q    (By Mr. Dorsett) Does that appear to be the statute, sir?

22 A    Yes, sir.

23 Q    And again, I'm focussing on 5845.  Is that what I gave you?

24 A    Yes.

25 Q    Section (a)(8).  It says, "Firearm includes a destructive

1    device."  Is that right?

2    A    Right.

3    Q    And then down at letter (f) is where the definition of a

4    destructive devise is located; is that correct?

5    A    Yes.

6    Q    All right.  Now, number (1) under (f) talk in terms of any

7    explosive, incendiary or poison gas.  You see that?

8    A    Right.

9    Q    Now, we're not talking about a poison gas here, aren't we?

10    A    No, we're talking about explosive.

11    Q    Talking about explosive.  And I'll just try to shorten

12    this.  Under (f)(1)(A) it mentions a bomb, correct?

13    A    Yes.

14    Q    Is that the type of explosive we're talking about in this

15    case?

16    A    Could be a bomb and it could also be an incendiary with

17    what he had also.

18    Q    All right.  There's -- so it's not a grenade under Letter

19    (B) that we're talking about here, is it?

20    A    It'd be considered a grenade.

21    Q    All right.  You tell me the difference --

22    A    Pipe bomb, yes, sir.

23    Q    Say again.

24    A    With the pressure cooker and the components he had, it

25    could be considered a -- a grenade also.  I mean, it's -- it's

1  the same thing.  It's --

2  Q    Well, I guess I -- being from --

3  A    It's gonna -- it's gonna blow up and throw shrapnel out.

4  Q    I guess being from the parts of Texas that I'm from, a

5  pressure cooker is a little bit big to throw as a grenade.

6  A    You don't have to throw a grenade, sir.

7  Q    Okay.  So it is a rocket under letter (C)?

8  A    Probably not, sir.

9  Q    It is a missile, letter (D)?

10 A    Nah.  No, sir.

11 Q    Is it a mine under letter (F)?

12 A    It could be considered a mine too, sir.

13 Q    Okay.  So if you step on it, it's going to --

14 A    Ah, not --

15 Q    -- explode?

16 A    It could be placed and it could be set for a timer or -- or

17 victim activated also, sir.

18 Q    Well, you saw all the components, what do you consider it?

19 A    I consider it an improvised explosive device, sir.

20 Q    And it could have been --

21 A    That could be fired.

22 Q    Which you could call a bomb, under your testimony, a

23 grenade or a mine?

24 A    Yes.

25 Q    All right.

1  A      And --

2  Q      You also include similar device under letter (F)?

3  A      Similar device, yes, sir.

4  Q      All right.  Now, section (f)(2) talks in terms of a weapon

5  that can be readily converted to expel a projectile, but it has

6  barrels; is that right?

7  A      Yes, sir.

8  Q      This did not have any barrels, did it?

9  A      No, sir.

10  Q      This explosive device here?

11  A      No, sir.

12  Q      So we can exclude number (2), correct?

13  A      I think so, sir.

14  Q      All right.  Was there any item -- or let me ask you this:

15  Did you look at the -- you mentioned in the backpack an article

16  that contained how to make a bomb, I think in your mom's kitchen

17  or what have you.  You recall that?

18  A      I -- yes, sir, I remember looking at it.

19  Q      Did you read the article?

20  A      Not all of it, but I saw the photos and read most of it to

21  get the -- the idea.  What Mr. Abdo bought pretty much was what

22  was in the article.

23  Q      All right.  What was -- what were the components?  I assume

24  that that article listed components of a bomb.

25  A      Yes, sir.

1   Q    Kind of a shopping list, right?

2   A    Recipe, yes, sir.

3   Q    Recipe, what -- what have you.  What were they, the

4   components or the ingredients in your recipe in this magazine

5   article?

6   A    As near as I can remember, sir, it needed a power supply,

7   battery; initiator, which were the Christmas lights; an

8   explosive, which was the powder; a switch, which was the clocks;

9   a container, which was the pressure cooker; and a conduit or a

10  connector, which are -- which are wires.  Which he bought wires

11  separately or you could use the Christmas light wires.  But

12  those items are all the things he would have needed to construct

13  that destructive device.

14  Q    Did the magazine article in his recipe or list include

15  nails?

16  A    It might have.  I've seen some with nails.

17  Q    Well, do you remember whether this --

18  A    Ball bearings.

19  Q    -- magazine article included nails?

20  A    I don't recall, sir.

21  Q    All right.  Did my client -- was there any item my client

22  did not possess which was needed to assemble a destructive

23  device?

24  A    Did -- did not possess?

25  Q    Yeah.  Was he lacking something?

1  A    Oh, no, sir.  He had more than enough.

2  Q    Okay.  What a -- what specific amount -- what's the minimum

3  amount of gun powder that's needed to make this a destructive

4  device?

5  A    Depends on what he wanted to do, sir.  I mean, pressure

6  cooker -- he bought six pounds, which would have definitely

7  filled up one of the pressure cookers.

8  Q    So how do you define a "destructive?"  I mean, how much

9  destructive -- destruction does something have to be able to

10  cause before it's destructive?  Can you quantify that for me?

11         AUSA FRAZIER:  I'm going to object to the relevance of

12  the question, Your Honor.  The destructive device in this case

13  is the components with the parts itself.  So any opinion is

14  not -- is beyond the scope of this hearing.

15         MR. DORSETT:  It -- Your Honor --

16         THE COURT:  I'm going to give him a little bit of

17  leeway.  Overruled.

18         MR. DORSETT:  Thank you, Your Honor.

19  Q    (By Mr. Dorsett) Do you know how much gun powder it would

20  take to make a device destructive?

21  A    Fire cracker, sir.

22  Q    A fire cracker's destructive?

23  A    Yes, sir.

24  Q    Okay.

25  A    Depends on how it's use.

1  Q    So you're telling the -- telling us that all the components

2  that were needed for a destructive device were present in the

3  room, Room 230?

4  A    Yes, sir.

5  Q    Were they present in the backpack?

6  A    Some of the items were, sir.

7  Q    Okay.  But separate and apart from the backpack, is it your

8  testimony that everything in the room could have been used to

9  create a destructive device?

10  A    Not everything in the room.  The -- the components in the

11  room that I described --

12  Q    Fair enough.

13  A    -- were in the room, yes, sir.

14  Q    He didn't need anything out of the backpack to go into the

15  room and -- and assemble this alleged destructive device; is

16  that right?

17  A    No, sir.

18  Q    It's not right?

19  A    I don't think -- I don't think he needed anything in the

20  backpack.  He had --

21  Q    All right.

22  A    -- extra stuff in the backpack that were more components.

23  Q    All right.

24  A    He just didn't have the gun powder with him, I don't think.

25  Q    Can you tell us, Officer Brogan -- Agent Brogan --

1    A    Special Agent Brogan, sir.

2    Q    Okay.  Special Agent Brogan.  Can you tell us the items

3    that were listed, how you use those to construct this

4    destructive device?

5    A    I --

6            AUSA FRAZIER:  Again, Your Honor, I'm going to object

7    to the relevance of the question.  It's beyond the scope of this

8    hearing.

9            MR. DORSETT:  I disagree, Your Honor.  I mean he --

10   he's testifying that all the components were there necessary to

11   create a destructive device and I'm try to ask him what

12   destructive device it is, how it's constructed.

13           AUSA FRAZIER:  And my response to that would be, Your

14   Honor, he's charged with the pieces of the -- of the destructive

15   device, now how it's conducted.  It's -- it's sufficient

16   probable cause just the fact that he has the components of it,

17   Your Honor.

18           THE COURT:  I understand that, but I'm going to give

19   him a little leeway for discovery purposes.  Overruled.

20   Q    (By Mr. Dorsett) Agent Brogan -- Special Agent Brogan?

21   A    Yes, sir.

22   Q    You listed the items in the room that were relevant items,

23   as Mr. Frazier said -- well, how do you take those items and

24   construct this destructive device?

25   A    I'd really rather not say, but it's -- you could get bomb

1  technicians or agents killed making these devices and I don't

2  want it public view, even though a lot of it is on the internet,

3  sir.  And I don't know how exactly he was going to do it.

4  Q    Okay.  Well, you --

5  A    But I know how I would have done it.

6  Q    And how would you have done it?

7          THE COURT:  I don't know how he would have done it is

8  particularly relevant.  It'd be speculation as to what the

9  defendant would have done.  So I don't think I'm going to allow

10  as to how he would have done it with these --

11          MR. DORSETT:  Sure enough, Judge.

12          THE COURT:  -- firearms.

13  Q    (By Mr. Dorsett) Mr. Brogan, you testified that you

14  reviewed my client's statements; is that correct?

15  A    Yes, sir.

16  Q    Did he say how he was going to do it?

17  A    He was just going to assemble a component, sir.  I don't

18  think he laid out line by line exactly how he was going to do

19  it, but it was going to be a -- a timed device with a clock.

20  Q    Okay.  And a pressure cooker?

21  A    That was the container to hold the gun powder and the

22  shrapnel.

23  Q    Okay.  And what was the shrapnel you're talking about?

24  A    Pieces of the container, sir.

25  Q    Okay.  Nothing else?

```
 1   A    There was shotgun shells inside one of the containers that
 2   he was cutting apart that were in a -- the contents were emptied
 3   in the container.
 4   Q    Now, you testify about the backpack and where it was found
 5   out in the parking lot -- or on him and it was taken from him in
 6   the parking lot; is that correct?
 7   A    Yes, sir.
 8   Q    And it's my understanding that a bomb squad disassembled
 9   the backpack and rendered it safe.  Is that your understanding?
10   A    Yes, sir.
11   Q    Do you know how that's accomplished?  Do they rip the
12   backpack apart?
13   A    You're getting into technics -- tactics, techniques and
14   procedures of bomb techs again, sir.  I'd rather not put that
15   out to the public.
16   Q    Well --
17   A    But there's various ways, sir.  I mean --
18   Q    Well, this -- it's my understanding they use a robot.  Do
19   you know how they would have done that?
20   A    Yes, sir.  I also understand they may have used a -- a hook
21   and line where they put some hooks on the zippers and pull it
22   from a remote distance, so if it was to explode or high order,
23   nobody would be hurt.  But a robot could do the same thing, sir.
24   Q    Okay.  Are the contents of the backpack removed in this
25   process?
```

```
 1  A    Removed and or exposed so they can be seen, observed

 2  through the cameras on the robot maybe or --

 3  Q    All right.

 4  A    -- by binoculars, I guess.

 5  Q    Is it your understanding and did you read a report that the

 6  canine -- a canine dog trained to detect explosive failed to

 7  alert three times on the backpack?  Were you aware of that?

 8  A    No, sir, I was not.

 9  Q    Okay.

10  A    But that doesn't matter.  I work with the dogs all the

11  time, sir.

12  Q    Okay.  The statute that we're dealing with, Agent Brogan,

13  under 5845(f), talks in terms of a device that's being

14  confert -- converted into a destructive; is that correct?

15  A    Excuse me now.

16  Q    Yeah.  I stumbled over my tongue there.

17  A    That's all right, sir.

18  Q    The statute --

19          THE COURT:  He's directing you back to the statute.

20          THE WITNESS:  Oh, okay.

21  Q    (By Mr. Dorsett) Section 5845(f) talks in terms of a device

22  that is being converted into a destructive device.  Do you see

23  that?

24  A    Yes, sir.

25  Q    What is the device here that's been converted into a
```

1    destructive device; do you know?

2    A    He was converting all these components into a destructive

3    device, sir.

4    Q    Okay.  So it's not just one device being constructed, it's

5    all these components, that's the device; is that what you're

6    saying?

7    A    Yes.

8    Q    All right.

9    A    And he, I think, was going to make two but he didn't have

10   enough gun powder.  So he had two pressure cookers in the room.

11   Q    Okay.  So it's your assumption that he's using the pressure

12   cookers then, right?

13   A    Yes, sir.

14   Q    All right.  There was no actual destruct --

15   A    I think -- I think he actually said it in one of the

16   statements, sir.

17   Q    There is no actual destructive device, completed

18   destructive device, that exists in this case, is there?

19   A    No, sir.

20   Q    Okay.  The destructive device that my client allegedly was

21   going to create or put together, how long would it take to put

22   it together?

23   A    Five, ten minutes, sir.

24   Q    Okay.  You've done that before?

25   A    I've made some, sir.  Yes, sir.

1  Q    Okay.

2  A    But he propose -- he -- he stated that he was building a

3  bomb, so that's -- that's why they took the precautions with the

4  backpack.  So no matter what the dogs did, they treated it as a

5  suspect device based on his statement.  So...

6  Q    Have you ever seen a destructive device using a pressure

7  cooker?

8  A    Yes, I have.

9  Q    Okay.  Where?

10  A    In Bagdad, sir.

11  Q    Okay.  Ever here in a legal case in -- in -- in the United

12  States?

13  A    No, sir.  But, you know --

14  Q    Okay.

15  A    -- it can be galvanized pipe, it can be anything.  It can

16  be a Ziploc bag.

17  Q    Now, when you -- I'm sorry go ahead.

18  A    Yeah, it could be a Ziploc bag with powder in it, it would

19  still go.

20  Q    And when the -- when the components are all put together,

21  how long does it take to detonate?

22  A    You complete the circuit, it'll detonate on the spot, sir.

23  Q    Okay.

24  A    I mean, if he --

25  Q    Well, explain that.

```
1    A    If he winds up the battery without -- without having the
2    clock and the switch in the -- in the series...
3    Q    The clock is like a fuse, a delayed fuse?
4    A    That's like a switch.  Like a light switch, right.
5    Q    Okay.  All right.
6    A    In this case it would have been a time delay; whatever he
7    set the time delay for.
8    Q    Okay.  Now you mentioned, Agent Brogan -- Special Agent
9    Brogan that this is a type of device that needs to be registered
10   with this outfit you told us about, correct?
11   A    Yes, sir.
12   Q    All right.  And how do you go about -- like a firearm, a
13   gun would have to be registered there, correct?
14   A    Yes, sir.
15   Q    How do you go about registering a firearm there?
16   A    You contact Bureau of Alcohol, Tobacco and Firearms and
17   they have forms you fill out; whether you're making firearms or
18   you're a gun store owner or whatever.
19   Q    Okay.  And in this case with the components that we had
20   that you're calling a destructive device, would just list the
21   things you have together and that's how you'd register it?
22   A    Yes.  And he would reg -- he would list what he was
23   ultimately going to build also.
24   Q    So you have to list what you're going to ultimately build?
25   A    Yes, sir.
```

1  Q    All right.  Was the Springfield .40 caliber handgun

2  registered; do you know?

3  A    No, sir, it was not.

4  Q    Okay.  Now, if I -- if I'm understanding though correctly,

5  it's --

6  A    No -- no firearms are registered to him.

7  Q    If I'm understanding correctly though, Special Agent

8  Brogan, Mr. Abdo -- each of the items he possessed that you're

9  calling relative items or components of a destructive device, in

10  and of themselves each one's legal to possess, correct?

11 A    Yes, sir.

12 Q    Okay.  I mean, he -- he went to the --

13 A    He bought them, yes, sir.

14 Q    -- gun store and bought the powder, correct?

15 A    Uh-huh.

16 Q    Okay.  So in and of themselves, each item is legal?

17 A    Yes, sir.

18 Q    Right.  Okay.

19 A    Except for -- I guess the gun, sir.

20 Q    All right.  Well, the gun wasn't part of the --

21 A    Right.

22 Q    -- destructive device --

23 A    Right.

24 Q    -- was it?  Correct?

25 A    That's correct, sir.

1    Q    So I'm just talking about the relevant items you talked

2    about with Mr. Frazier.

3    A    Components of destructive devices.

4    Q    All right.  Is there anyone else involved in this

5    investigation or case here today?

6    A    Um --

7    Q    We know that Agent Runkel's right here; is that right?

8    A    Yes, sir.

9         AUSA FRAZIER:  I'm going to object to the relevance of

10   that question, Your Honor.

11        MR. DORSETT:  Your Honor, I -- I may call him as a

12   witness --

13        THE COURT:  All right.

14        MR. DORSETT:  -- to plaintiff's testimony.

15        THE COURT:  You -- you may answer the question.

16        THE WITNESS:  Yes, sir.  Special Agent Steve Hauck

17   is -- is here also.

18   Q    (By Mr. Dorsett) Okay.  Now, Special Agent Steve Hauck is

19   the agent whose affidavit -- that's what you relied up to

20   establish that the destructive device was not registered; is

21   that correct?

22        AUSA FRAZIER:  This is not relevant, Your Honor.

23        THE COURT:  Again, Mr. Frazier, I think it goes to the

24   source of the witness's information for his testimony here

25   today.

```
 1              AUSA FRAZIER:  I understand.
 2              THE COURT:  As long as he's using it to explore that,
 3   I feel it's relevant.
 4              AUSA FRAZIER:  Yes, sir.
 5   Q    (By Mr. Dorsett) Is Special Agent Hauck the agent whose
 6   affidavit is relied upon by Special Agent Runkel to establish,
 7   one, that -- I'll withdraw that.
 8              Is Special Agent Hauck the agent that Special Agent
 9   Runkel spoke to to talk about whether or not these components
10   established or were a destructive device?
11   A    Yes, sir.
12   Q    Okay.  The con -- or the items that were found in the room,
13   Special Agent Brogan, were they still in their packages?
14   A    Some were, some weren't.
15   Q    Okay.  Which weren't?
16   A    I think the -- the clock -- the clocks were opened.  I
17   don't remember all of them.  But the powder was still in its
18   packages.
19   Q    What types of clocks --
20   A    The shotguns were opened; the shotgun shells were opened.
21   Q    Okay.  What type of clocks were these?
22   A    Just wall clocks, I think Mainstay or something was --
23   Q    Like a wall clock like this?
24   A    Yes, sir.
25   Q    Pardon me?
```

1  A    Yeah.  I think smaller like -- wall clock, yes, sir.

2  Q    Okay.  Some -- and I saw that it was referred to as a wall

3  clock, but I want to make sure that wasn't a brand or something.

4  You're just talking about a clock you hang on the wall?

5  A    Yes, sir.

6  Q    All right.  The drill wasn't part of the destructive

7  device, was it?

8  A    No, sir.  But I can see why he would have needed a drill.

9  Q    But in and of itself it wasn't part of the destructive

10  device?

11  A    No, sir.

12  Q    Okay.

13  A    I mean, he could have put it in, but it -- yeah, you didn't

14  need it for...

15  Q    Okay.

16        MR. DORSETT:  Pass the witness.

17        THE COURT:  All right.  Mr. Frazier, redirect?

18        AUSA FRAZIER:  No, Your Honor.  We pass the witness.

19        THE COURT:  All right.  Special Agent Brogan, you may

20  step down.

21        Government may call its next witness.

22        AUSA FRAZIER:  Government rests, Your Honor.

23        THE COURT:  All right.  Very well.

24        Does defense have any witnesses it wishes to offer

25  at this time?

1          MR. DORSETT:  I'd like to call Agent James -- Special

2    Agent James Runkel.

3          THE COURT:  All right.  Special Agent Runkel, if

4    you'll come forward.

5

6                          **JAMES RUNKEL,**

7    having first been duly sworn, testified to the following:

8

9          THE COURT:  All right.  You may proceed once he's

10   seated.

11         MR. DORSETT:  Thank you, Your Honor.

12                       DIRECT EXAMINATION

13   BY MR. DORSETT:

14   Q    Can you state your name for the record, please.

15   A    Yes, sir.  My name is James E. Runkel.  Runkel's spelled

16   R-u-n-k-e-l.

17   Q    Okay.  And Agent Runkel -- Special Agent Runkel, I

18   apologize.

19   A    Yes, sir.

20   Q    Now, you and I have never met before, have we?

21   A    We have not.

22   Q    And you are employed how, sir?

23   A    I'm a Special Agent with the Federal Bureau of

24   Investigation.

25   Q    All right.  And have been so how long?

1    A    For over four years.

2    Q    Okay.  And you are the individual who actually executed the

3    affidavit that -- that Mr. Frazier asked the Court to take

4    judicial notice of?

5    A    Yes, sir.

6    Q    Okay.  You've -- you've heard all the testimony of -- of --

7    of Special Agent Brogan.  Did you hear anything he said wrong or

8    incorrect?

9    A    No, sir, I did not.

10   Q    Okay.  I'm going to talk to you briefly, if I could,

11   Special Agent Runkel, about your involvement.  You -- you

12   actually were at the scene in Killeen; is that correct?

13   A    Yes, sir, that's correct.

14   Q    And --

15        AUSA FRAZIER:  And I'm going to object to this line of

16   questioning, Your Honor, because this goes nothing to probable

17   cause.  We are here for probable cause and probable cause only.

18   The United States has established probable cause through the

19   witness.  And unless he is indicating through his questioning

20   that -- the question specifically about that, then his testimony

21   would be irrelevant because it's beyond the scope of this

22   hearing.

23        THE COURT:  Are you asking with respect to his

24   examination of the items that constitute the destructive

25   device --

1          MR. DORSETT:  That --

2          THE COURT:  -- based off the scene?

3          MR. DORSETT:  That's where I'm --

4          THE COURT:  Is that the point of your questioning?

5          MR. DORSETT:  That's where I'm headed, Your Honor.

6          THE COURT:  All right.  As long as you're headed in

7    that direction, I'll permit it.

8          MR. DORSETT:  I will, Your Honor.  And I'll -- I'll be

9    brief.

10         THE COURT:  All right.  Thank you.

11   Q    (By Mr. Dorsett) Special Agent Runkel, you were at the

12   scene on -- at Killeen at the America's, what, Best Value Hotel?

13   A    Yes, sir, I was.

14   Q    And when did you arrive; was it on the 27th?

15   A    Yes, sir, on the 27th at approximately 3:00 p.m. Central

16   Time.

17   Q    All right.  You weren't involved with any of the activities

18   on the 26th?

19   A    No, sir, I was not.

20   Q    All right.  That was all Killeen PD?

21   A    That is correct.

22   Q    Okay.  I want to talk to you about the items that were

23   found in the -- both in the backpack and those in the Room 230,

24   okay?

25   A    Yes, sir.

1  Q    Now, the backpack, Special Agent Brogan testified, while

2  some of that could have been used as part of the destructive

3  device, a component or two of -- not everything was present in

4  the backpack that was needed to construct a destructive device;

5  is that right?

6  A    Yes, sir.  The -- there were components that were -- that

7  could be used for a destructive device that were inside the

8  backpack.

9  Q    Uh-huh.

10  A    But all the components to make a destructive device, as I

11  understand it, were not in the backpack at the time of the

12  seizure.

13  Q    Okay.  What components in the backpack could have been used

14  for a destructive device?

15  A    From what I recall, sir, seeing the backpack as the

16  contents were laid out by the Explosive Ordinance Disposal Team,

17  there were clocks, there were two spools of wire, and from what

18  I recall, a battery.

19  Q    Okay.  What kind of battery?  Just a --

20  A    I -- it was a -- I'd have to look at the actual picture

21  again, but I remember -- I remember seeing a battery, but I'd

22  have to reconfer with my inventory list of that particular

23  search.

24  Q    Would you like a copy of your affidavit?

25  A    Sure.

1    Q    That would help?

2    A    That'd be great.

3            MR. DORSETT:  May I approach, Your Honor?

4            THE COURT:  You may.

5    (BRIEF PAUSE)

6    Q    (By Mr. Dorsett) Have you found it there, Special Agent

7    Runkel; as far as the inventory in the -- in the backpack.

8    A    Yes, sir.  I -- the -- again, I'd have to look at my -- if

9    you reread the affidavit, sir, "Some of the items found inside

10   the backpack searched by the officers were as follows..."

11   Q    Uh-huh.

12   A    Those were the -- some of the items that we listed:  Two

13   clocks, twos spools of auto wire, the ammunition, the handgun,

14   and the Model XD.

15   Q    And that's something I wanted to ask you about, because the

16   affidavit does speak in terms -- when it's talking about the

17   contents of the backpack, it says, "Some of the items found in

18   the backpack..."  So there were other items found in the

19   backpack that aren't listed in your inventory of the backpack?

20           AUSA FRAZIER:  Objection, Your Honor.  It's not

21   relevant to this hearing.

22           MR. DORSETT:  Well, I don't know if it's relevant,

23   Your Honor.  I don't know what the other items are.

24           THE COURT:  I'm going to allow him to get into what

25   was found in the backpack.  The witness, Special Agent Brogan,

1  did testify that some of the items contained in the backpack

2  could be utilized in the formation of a destruction device.  So

3  I will permit testimony as long as it relates to that specific

4  issue.  Overruled.

5  Q    (By Mr. Dorsett) Do you recall what the other items were

6  that aren't listed in your affidavit?

7  A    The -- again, sir, I'd have to confer with my inventory

8  list.  But the items pertinent to this particular statute, those

9  are items we were -- we reviewed with our certified special

10 agent bomb technician to -- to get their opinion, as I'm not the

11 expert on bomb construction.  They are.

12 Q    All right.  So the pert -- to use your word, the pertinent

13 items from the backpack are listed in your -- your affidavit?

14 A    That is correct.  Yes, sir.

15 Q    As it pertains to this statute my client's charged with?

16 A    Yes, sir.

17 Q    And it's my understanding there may have been a computer in

18 the backpack.

19 A    That's correct, sir.

20 Q    That didn't have anything to do with the destructive

21 device?

22 A    From the opinion of the special agent bomb technician, no,

23 it did not.

24 Q    Okay.  And as far as the -- could that be said of all the

25 other -- any other items found in the backpack that are -- are

1  included in this some of -- the word "some."  Are there -- you

2  see what I'm saying?

3  A    No, sir, I do not.

4  Q    I apologize.  Could that -- the same thing be said of other

5  items that were not included in your list in the affidavit, that

6  they weren't important to --

7  A    Again, sir, without my inventory list of that particular

8  search on the backpack, I would prefer not to generalize about

9  the other items.

10  Q    Okay.

11  A    There's a variety of tactics, techniques and procedures out

12  there for bomb construction.

13  Q    Okay.

14  A    But I do know from the certified special agent bomb

15  technician these components listed in the affidavit could be

16  used as part of a destructive device.

17  Q    All right.  All right.  Did you read the article that was

18  contained in the backpack?

19  A    I reviewed it, yes, sir.

20  Q    Are you familiar with the list of -- of components it

21  contains?

22  A    Yes, sir.  Again, without the article in front of me --

23  Q    Uh-huh.

24  A    -- I would have to -- I -- I do not want to speculate on

25  the specific items that were in there.

1  Q    Okay.  Were you involved -- you were also involved in the

2  search of Room 230, correct?

3  A    Yes, sir, I was.

4  Q    Okay.  And same thing as to your affidavit, all the items

5  that at least were important to the expert, as far as bombs or

6  destructive devices are concerned, are listed in your affidavit?

7  A    Yes, sir.

8  Q    Because your -- again, your affidavit as to the Room 230

9  states, "Items seized included but are not limited to the

10  following items..."  Correct?

11  A    That's correct.

12  Q    All right.  And so there are -- there are other items that

13  were seized, but they don't really have anything to do with

14  components of a destructive device?

15  A    That is correct.

16  Q    All right.

17        MR. DORSETT:  I'll pass the witness.

18        THE COURT:  All right.  Mr. Frazier?

19        AUSA FRAZIER:  No questions, Your Honor.

20        THE COURT:  All right.  Special Agent Runkel, you may

21  return.

22            Are there other witnesses the defense wishes to

23  call?

24        MR. DORSETT:  Your Honor, briefly, I'd like to call

25  Steven Hauck.

 1          THE COURT:  All right.  If you'll come forward,

 2  please, sir.

 3

 4                    **STEVEN HAUCK,**

 5  having first been duly sworn, testified to the following:

 6

 7          THE COURT:  All right.  Once Special Agent Hauck is

 8  seated, you may begin.

 9          MR. DORSETT:  Thank you, Your Honor.

10                    DIRECT EXAMINATION

11  BY MR. DORSETT:

12  Q    Would you state your name for the record, please.

13  A    Steven C. Hauck, H-a-u-c-k.

14  Q    Special Agent Hauck, you and I have never met before, have

15  we?

16  A    No, sir.

17  Q    All right.  And where -- where -- how are you employed?

18  A    I'm a Special Agent with the Federal Bureau of

19  Investigation.  I'm out of the San Antonio Division, Austin

20  Resident Agency.

21  Q    Okay.  And were you present at fort -- or in Killeen on

22  either of these days, 26th, 27th or 28th?

23  A    I arrived the day of the search, approximately an hour

24  after Special Agent Runkel.

25  Q    Were you involved in the search?

1  A    I was not involved in the search.

2  Q    Did you talk to my client at all?

3  A    I did not.

4  Q    All right.  You are referenced in Special Agent Runkel's

5  affidavit; are you not?

6  A    I am.

7  Q    And what did he consult you about as far as this

8  affidavit's concerned?

9  A    The components necessary to construct an improvised

10  explosive device or destructive device.

11  Q    Is that your specialty?

12  A    I am a special agent bomb technician.

13  Q    And have you reviewed the items that were seized from the

14  hotel room?

15  A    I have.

16  Q    Okay.  And the items that are contained or listed in

17  Special Agent Runkel's affidavit, are those the ones that are

18  relevant as Mr. Frazier says?

19  A    If I could see that, sir, I'd be able to give you an

20  informed answer.

21  Q    The affidavit you mean?

22  A    Yes, sir.

23         THE COURT:  You may.

24  (INAUDIBLE SPEAKING.  OFF THE MIC)

25         THE WITNESS:  I would -- if I'd known I was going to

 1  testify, I'd have brought my glasses.

 2          MR. DORSETT:  I'll let you use mine.  They're

 3  magnifiers.  That's all they are.

 4          THE WITNESS:  I can borrow those.

 5  (BRIEF PAUSE)

 6          THE WITNESS:  Well, sir, on -- within the affidavit it

 7  does not specify the components, but I did provide information

 8  to him that the components found could be constructed to make a

 9  destructive device.

10  Q    Okay.  Well, on -- on the top of Page Two, first paragraph,

11  it talks in terms of the hotel room and the specific items

12  seized, included but aren't limited to.  It's the last sentence

13  in Paragraph Two -- of Paragraph One, excuse me.

14  A    I'm sorry.  Two?  Okay.  That's a different paragraph.

15  Q    I'm sorry.

16  A    Two clocks, smokeless shotgun shells, two pressure cookers.

17  Q    Are those the items that would make up the destructive

18  device that my client is charged with?

19  A    Well, you're still going to have a -- you're also going to

20  have a battery and a conduit for electrical current, which would

21  be wire.  And you would, in this case, have a Christmas

22  lightbulb to provide the impulse to the smokeless powder.

23  Q    Okay.

24          MR. DORSETT:  Pass the witness, Your Honor.

25          THE COURT:  All right.  Mr. Frazier?

```
 1              AUSA FRAZIER:  No questions, Your Honor.

 2              THE COURT:  All right.  Special Agent Hauck, you may

 3    return to your seat.

 4                 Do you have any further evidence that you wish to

 5    present?

 6              MR. DORSETT:  No, Your Honor.

 7              THE COURT:  Any rebuttal?

 8              AUSA FRAZIER:  No, Your Honor.  We rest and close.

 9              THE COURT:  All right.  Would you like to proceed with

10    your argument?

11                   CLOSING ARGUMENT BY THE GOVERNMENT

12              AUSA FRAZIER:  Your Honor, just very briefly.  Since

13    this is a probable cause hearing, the United States has put

14    forth evidence as to each and every element of the offense as

15    outlined in the criminal complaint.  That the defendant

16    possessed a firearm as defined by Title 26, and that firearm

17    includes a destructive device.  And as that term is defined

18    under federal law, it includes the parts of a destructive device

19    or any combination of those parts that could be used to build

20    such a destructive device.

21                 In that particular case, the -- the evidence is more

22    than sufficient to show not only the defendant exercised

23    dominion over -- and control over some of the parts necessary to

24    build a destructive device, based on the evidence that's

25    presented here today and in the affidavit and the defendant's
```

1   own statement that he made to law enforcement, not once but at

2   least another occasion, it's exactly what he intended to do.  He

3   had all the components necessary to build the destructive

4   device.  How he was going to do it is -- is -- would be

5   speculation on the part of these witnesses.  But everything was

6   necessary to do that and by his own admission, that is what he

7   intended to do.

8           Likewise, the evidence also shows that the -- that

9   the components necessary for the destructive device are required

10  to be registered according to federal law.  And -- and a

11  registration check was done by the Bureau of Alcohol, Tobacco,

12  and Firearms.  And the National Firearms, Registration and

13  Transfer Record revealed -- that search of that record revealed

14  that no firearms, as defined by Title 26, which are, as this

15  Court is aware, specialty -- specialty firearms; that is,

16  machine guns, short-barrelled firearms, destructive devices,

17  things of that nature, not -- not handguns or things like that.

18  Those are not, as this Court is aware, required to be registered

19  under Title 26.  But those specialty items, like destructive

20  devices, have to be registered first in the NFRTR, and it was

21  not.  And this defendant in fact has no firearms or destructive

22  devices registered in the national -- in the NFA.

23          We also showed by a preponderance of the evidence,

24  at least by a preponderance of the evidence, that this offense

25  occurred in the Western District of Texas in this division and

1   it occurred in Bell County on the date so indicated on the

2   criminal complaint.

3          We ask the Court to find probable cause in this

4   case, the case be bound over to the Grand Jury for presentation

5   for consideration of an indictment.  That's all we have.

6          THE COURT:  All right.  Thank you.  Mr. Dorsett.

7          MR. DORSETT:  Briefly, Your Honor.

8                CLOSING ARGUMENT BY THE DEFENSE

9          MR. DORSETT:  Your Honor, there -- the -- the

10  testimony is there was no destructive device assembled, but

11  there were all these parts.  And I'll venture a guess there's

12  somebody in this room, if not more than one or two or three,

13  that have all these same parts.

14         AUSA FRAZIER:  Object to side bar remarks, Your Honor.

15  I would ask him to define it to -- confine his remarks to the

16  Court.

17         MR. DORSETT:  This is argument, Your Honor.

18         THE COURT:  I understand.  You may proceed.

19         MR. DORSETT:  That there's more than one person in

20  this courtroom that have all these same components in their

21  house, and -- and they're not being charged with possessing a

22  destructive device.  There's no evidence of readily assembled.

23  The phase in -- in the statue that it has to be readily

24  assembled, I don't think there's any evidence of that.  And

25  we -- we'd submit that the complaint should be dismissed.

1                    THE COURT:  All right.  Thank you.

2                        Anything further you'd like to add?

3              AUSA FRAZIER:  No, Your Honor.

4              THE COURT:  All right.  Thank you.

5                    Mr. Abdo, if you'll please stand.

6                    All right.  Thank you.

7                    Mr. Abdo, based upon the testimony of Special Agent

8    Michael Brogan, as well as the statement that you provided to

9    law enforcement, as well as the inventory of the contents of the

10   backpack as well as Room 30 (SIC) of America's Best Value Inn,

11   the Court finds that the government has established that

12   probable cause exists that on or about or about July 27, 2011,

13   in Bell County in the Western District of Texas, that you did

14   possess a firearm as defined by Title 28, United States Code,

15   Section 5845(a) and (f), namely a destructive device, which

16   firearm was not registered to you in the National Firearms

17   Registration and Transfer Record in violation of Title 26,

18   United States Code, Section 5861(d) and 5871.

19                    At this time, the Court is going to refer this

20   matter to the Grand Jury where they can indict you not only on

21   this charge but perhaps other charges as well arising out of the

22   facts that form the basis of this particular hearing.

23                    Is there anything further from the government at

24   this time?

25              AUSA FRAZIER:  No, sir, Your Honor.

1              THE COURT:  All right.  Is there anything further from

2    the defense?

3              MR. DORSETT:  No, Your Honor.

4              THE COURT:  All right.  Thank you.

5               I'll go ahead and let the marshals return Mr. Abdo

6    to holding and then we'll go ahead and proceed with the rest of

7    the docket.

8               If you'll bring the remaining defendants out.

9    (END TIME, 3:02:40 P.M.)

10                              -oOo-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  **C E R T I F I C A T E**

2

3

4   U.S. DISTRICT COURT          )

5   WESTERN DISTRICT OF TEXAS    )

6   WACO DIVISION                )

7

8

9           I, VICKIE-LEE GARZA, Court Approved Transcriber,

10  certify that the foregoing is a correct transcript, to the best

11  of my ability, from the official electronic sound recording of

12  the proceedings in the above-entitled matter.

13

14          Certified to by me this 13th day of December, 2011.

15

16

17                      /s/    VICKIE-LEE GARZA
                        TX CSR #9062, Expires 12/31/12
18                      Firm Registration No. 79

19

20

21

22

23

24

25